NOT FOR PUBLICATION

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| GREGORY BUTLER, | Civil Action No. 16-8258-BRM |
| Petitioner, | |
| v. | **OPINION** |
| STEVEN JOHNSON, et al., | |
| Respondents. | |

**MARTINOTTI, DISTRICT JUDGE**

Before this Court is the Amended Petition for a Writ of Habeas Corpus of Petitioner Gregory Butler ("Petitioner"), brought pursuant to 28 U.S.C. § 2254. (ECF No. 5.) Following an order to answer, Respondents filed a response to the petition (ECF No. 11), to which Petitioner has replied (ECF No. 12). For the reasons set forth below, Petitioner's habeas petition is **DENIED**, and Petitioner is **DENIED** a certificate of appealability.

## I. BACKGROUND

In its opinion affirming the convictions and sentences of Petitioner and one of his co-defendants, the New Jersey Supreme Court provided the following summary of the factual background of Petitioner's trial:

> On November 29, 2000, Christine Staton (Staton) and her twenty-five-year-old son, Lonell Michael (Michael), were found dead and bound together in her bedroom. Each had been killed from a gunshot wound to the back of the head. Staton's throat had also been slashed. The ensuing investigation led police to three primary suspects: [Petitioner], defendant Dwayne Gillispie (Gillispie), and Keith Mercer (Mercer). On July 27, 2004, Gillispie and [Petitioner] were indicted for first-degree conspiracy to commit murder; second-degree conspiracy to commit armed robbery; two counts each of capital murder, felony murder, first-degree robbery, and second-

1

degree burglary; second-degree possession of a weapon for an unlawful purpose; third-degree unlawful possession of a weapon; and third-degree theft.

Before their trials commenced, the State moved to introduce evidence that defendants had participated in a robbery and shooting that took place at a Bronx barbershop twenty days before the Barnegat murders. The trial court conducted a joint N.J.R.E. 104 hearing to determine whether the other-crimes evidence was admissible. At that hearing, the State called four witnesses: Mercer, an alleged accomplice to both the barbershop robbery and the Barnegat murders who was testifying against defendants pursuant to a plea agreement; New York City Detective Kevin Mojica, who had responded to the scene of the barbershop robbery and subsequently interviewed Gillispie after taking him into custody; Detective Kevin Barry, a ballistics expert; and Sol Cepero, a woman who had been sharing an apartment with Gillispie at the time that these crimes were committed.

At the N.J.R.E. 104 hearing, Mercer detailed his involvement with Gillispie and [Petitioner] in the barbershop robbery, including the use of a gun that was also used to kill Staton and Michael. Detective Mojica testified that after Gillispie was arrested for the barbershop robbery, he admitted to committing it with an "accomplice." When told detectives from New Jersey wanted to talk with him about an incident there, Gillispie stated, "probably [the] same gun was used;" he then remarked, "[t]ell Jersey the guy you locked up is the guy who did the shooting in Jersey." However, Gillispie never implicated [Petitioner] in his interview with Detective Mojica.

Next, Detective Barry testified and concluded, based on his expert examination of bullet cartridge casings, that the same gun had been used in both the barbershop robbery and the Barnegat murders. Finally, Cepero testified that on the morning after the Barnegat murders, Gillispie angrily confronted her, saying that someone had taken a ring from his pocket the night before—the ring being one shown to her following the murders. When Cepero's boyfriend intervened, Gillispie struck the boyfriend in the head with the butt of a pistol and caused substantial bleeding. Cepero also testified that during this altercation, Gillispie pointed the gun at Cepero, cursed at her, and said, "I had to put bullet holes in motherf- - -ers" for the jewelry.

At the conclusion of the N.J.R.E. 104 hearing, counsel for both [Petitioner] and Gillispie reiterated their continuing objections

to admission of the evidence. However, the trial judge determined that, while the evidence "may be a part of a plan and it might be part of intent or proof of motive . . . the key issue here and the key exception, if you will, to the exclusion is the identity issue." The court found that the admission was controlled by, and satisfied, the four-prong test established by *State v. Cofield*, [127 N.J. 328] (1992). It found the first prong of *Cofield* was satisfied because the other-crimes evidence was relevant to the issue of "identity as to whether or not Defendant Gillispie is the person who committed this crime." The court found the second prong—conduct similar in kind and close in time—was satisfied because both crimes were robberies of drug dealers, in which weapons were used and the incidents occurred within twenty days of each other. Prong three was deemed satisfied because Detective Barry's "expert testimony" made it "unquestionably clear and convincing" that the same gun was used in both robberies and was "strongly corroborative" of Mercer's testimony.

As to the fourth *Cofield* prong—whether the probative value of the evidence was outweighed by the prejudice to the defendant— the court acknowledged that all evidence offered by the State "is prejudicial by its nature." Nevertheless, the court also stated that the probative value of the evidence at issue was "extremely strong" as it was "directly related to [the] material issue of identity." Therefore, the court concluded by ruling that it was "clearly convinced that the probative value [of the other-crimes evidence] clearly and definitely outweighs any prejudice to the defendant[s]," and found the other-crimes evidence to be admissible at trial.

. . . .

After the pre-trial proceedings concluded, defendants' cases were severed for purposes of trial. The relevant evidence introduced at Gillispie and [Petitioner]'s respective trials is described below.

. . . .

At Gillispie's trial, Mercer testified about the Bronx robbery and the Barnegat murders. He testified pursuant to a plea agreement and provided an exhaustive account of the events that transpired on the day of the Barnegat murders, including the details of Gillispie cutting Staton's throat in an effort to get Michael to disclose where the money was kept, and then shooting Staton and Michael in the head through a pillow.

Michael's girlfriend, Heather Ballman, testified that on November 28, 2000, Michael spoke to someone on his cell phone around 10:00 p.m. and then hurriedly asked Ballman to drive him to Cumberland Farms in Barnegat. Ballman testified that she last saw Michael getting into a dark colored car with Virginia license plates. At trial, the State further demonstrated that, after further investigation, the Ocean County Prosecutor's Office obtained information from Michael's cell phone records indicating that the last call Michael had received was from a phone registered to an individual named Shawnta Watkins.

Two detectives traveled to the Bronx, where Watkins lived, and within several minutes they observed a black Lexus with Virginia plates near Shawnta's residence being driven by [Petitioner]. Shawnta advised the police that while the cell phone in question was purchased by and registered to her, it was actually used by her sister, Janyce Watkins. The police interviewed Janyce and recovered from her a diamond ring that matched a photograph of a diamond ring found in an appraisal folder at Staton's home.

Janyce Watkins confirmed those events through her testimony. She testified that, in November 2000, [Petitioner] and Gillispie had discussed robbing a New Jersey drug dealer, and that the dealer would have to be killed because he knew Gillispie. Janyce also testified that on November 28, 2000, the day the murders took place, [Petitioner] asked her to connect him (using a three-way dialing option on her cell phone) to a cell phone number that had a "609" area code. While listening in on the call, she overheard what she believed to be [Petitioner] entering into a gun transaction with the party from New Jersey. Later that night, around 10:00 p.m., when [Petitioner] was in New Jersey, he called Janyce, who was at home in the Bronx, and asked her to connect him once again to the "609" number from earlier. Janyce complied, and overheard Gillispie and the "609" party agreeing to meet at Cumberland Farms. Janyce then testified that, later that night between 1:00 and 2:00 a.m., she met [Petitioner] at a hotel in the Bronx where he gave her a diamond ring—which he admitted to acquiring by tying up, robbing, and killing two people from New Jersey.

Michael Kreybig, another State's witness, also placed Gillispie near Barnegat on the night of the murders. He testified that he sold drugs for Gillispie and that on November 28, 2000, he met with Gillispie near Barnegat and paid him $800. Kreybig further testified that, on the night in question, Gillispie was with two other men and was driving a black Lexus with Virginia license plates.

The State also called witnesses to establish that, twenty days before the Barnegat homicides, Gillispie and [Petitioner] committed the attempted robbery of a barbershop in the Bronx, during which several people were shot but not killed.

Mercer began his testimony by indicating that he first met defendant [Petitioner] in Lewisburg Penitentiary around August 1994. Mercer remained an "associate" of [Petitioner]'s—serving a subsequent prison term in New Jersey with [Petitioner]—until the spring of 2000, when they were both released from prison.[1] Around August 2000, [Petitioner] contacted Mercer to ask whether Mercer knew any drug dealers that they might be able to rob. Mercer testified that [Petitioner] told him not to worry about any robberies coming back to Mercer, because—in Mercer's opinion—[Petitioner] was prepared to "kill" any drug dealers that he robbed. Mercer also stated that in October 2000, he rode with [Petitioner] and Janyce Watkins in a black Lexus with Virginia plates to investigate a potential robbery target, but nothing came of that venture.

Mercer testified that, over the course of several months, [Petitioner] continued asking about potential targets until eventually, in November, [Petitioner] solicited Mercer's assistance in robbing a "hair salon [or barbershop] in the Bronx." Mercer admitted that he agreed to participate, and that he met up with [Petitioner] to carry out the plan. At this point, Mercer testified that [Petitioner] introduced him to Gillispie, who would also participate in the robbery, and Mercer identified Gillispie in court. Mercer testified that the barbershop was selected because there was supposed to be a supply of marijuana in the basement, and no "resistance" was expected.

Mercer explained how he and Gillispie carried out the robbery:

> [Gillispie] came in 30 seconds—not long, right behind me. . . . And [Gillispie] was, like, on the count of ten, you know, we could take the place over. So he started counting, taking deep breaths: one, two. And by the time [a male patron] had got out of the chair and left, he had got to ten and pulled his gun

---

[1] Although Mercer testified that he had met Petitioner in prison during Gillespie's trial, he did not testify as to Petitioner's prior prison sentence or how they met on direct examination in Petitioner's trial. (*See* ECF No. 11-2 at 4-5.) Mercer also testified at Petitioner's trial that he had only known Petitioner by the name "Shaft" until after the incident that led to Petitioner's conviction. (*Id.*)

out and got the guy that was getting ready to do his hair.

. . . .

We were supposed to take them to the back, 'cause the marijuana was supposed to have been down in the basement. So we was going to take them in the back, and secure everyone in the back, and just go right down in the basement and take the weed, the marijuana.

. . . .

By the time—I had about two girls in front of me and I think maybe the girl that was getting her hair done. And [Gillispie] had moved everyone else to the back. There was a little step that you had to go up to, to get to the back area all the way in the back. . . . And in not too long, I just hear a bunch of shots, a lot of shots just start ringing out, boom, boom, boom, boom, boom.

Mercer testified that he and Gillispie immediately "took off" and fled the scene without taking any proceeds. Mercer indicated [Petitioner] was upset that Gillispie had "shot up the place" and that they "came out of there empty-handed."

The State also called Detective Barry as a ballistics expert in order to show that the same gun used in the barbershop robbery was also used in the Barnegat murders. Barry's ultimate conclusion was: "The total of five cartridge casings or shell casings from the hair salon, I compared to the two from New Jersey, and I found that the total of seven cartridge casings were all fired from one gun, the same gun." In support of that conclusion, the State elicited more specific testimony regarding the barbershop shell casings:

A: I received a total of five .40 caliber cartridge casings, or discharge shells, and two bullets, .40 caliber bullets.

. . . .

A: This, again, is a property invoice, and it's numbered K–615274 and it describes property which I examined.

Q: What did you examine?

A: It was a .40 caliber bullet.

Q: Recovered from?

A: Recovered from the victim in the Bronx.

. . . .

Detective Mojica was called during Gillispie's trial as one of the officers that responded to the scene of the barbershop robbery in New York. He testified that "there were several people that were shot at that location." Mojica provided detailed testimony regarding his observations upon reaching the crime scene in the Bronx:

A: . . . [T]here was a male being taken out on a stretcher at that point

. . . .

A: . . . [W]hen you walked toward the back of the location, there was blood on the floor on top of a couple of shell casings.

Q: And how—how many shooting victims were there?

A: There was three, total.

. . . .

A: The worst one was Christopher Folks. He was shot—he was shot four times. There was a Keith Adams shot in the leg area, and a Valerie McCloud, also shot in the leg area.

. . . .

Q: And what was the nature of Chris Folks' injuries?

A: Oh, he was the worst off.

. . . .

Q: Did anybody die as a result of the shooting in the barbershop in the Bronx?

A: No, sir.

Mojica then testified regarding the procedure he employed to collect and properly preserve evidence, such as the shell casings and discharged bullets. During this aspect of his testimony, Mojica was questioned specifically about one copper round that was apparently recovered from a victim at the scene:

Q: Okay. And what is that form—what does that form voucher? What's the property that's listed on the form?

A: One copper round. I vouchered it.

Q: And who recovered that copper round?

A: I did.

Q: Okay. And where did you recover it?

A: It was at the crime scene.

Q: Where, specifically, at the crime scene?

A: Outside of the location. My understanding was that it fell out of the body.

Q: Of who?

A: Mr. Folks.

. . . .

Eventually, Detective Mojica had the opportunity to interview Gillispie regarding the barbershop robbery, and Mojica testified at length about what happened during the interview. Mojica testified that Gillispie told him the following:

At the time [of the robbery, Gillispie] was getting everybody to the rear of the barbershop, every—most people complied and were cooperative with him. . . . When [a male in the barbershop] invaded his space, at that point Mr. Gillispie struck him with the

firearm. At that point he indicated that he let one round go, and it went into the air, and four other rounds hit the male.

Over objection, the State then had Mojica read directly from Gillispie's hand-written statement regarding the barbershop incident. The statement had been admitted into evidence, and provided:

> A: "[I]n early November, I received a tip that a barbershop had just received a large quantity of weed. An associate and I went into the barbershop. . . . I pulled out a gun and demanded everyone to move to the back. While everyone was on my left and about to proceed to the basement which supposed—supposedly stored the weed, a man bumped into me diagonally from my right rear. I said to the man, 'What the f[- -]k are you doing?' At this point, he put his hands shoulder high. However, we were in very close proximity, so I hit him with the gun and took a step back. At this point he moved towards me, and we made physical contact. Somehow a shot went in the air, and approximately five more were fired, three to four hitting the same man, and two hitting two other individuals."

When Mojica finished questioning Gillispie about the Bronx barbershop robbery, he told Gillispie that detectives from New Jersey were there to speak to him. Mojica stated that Gillispie's response to this was, "[p]robably the same gun was used." Mojica's testimony continued:

> Q: And had you—did you say something to [Gillispie] in response to that?

> A: At that point, I said, "Talk to the guys in Jersey. Just—they are here, just talk to them." At that point, he looks me dead in the face, and he goes, "Tell Jersey"—and he is pointing at me, and he says, "Tell Jersey the guy you locked up," and he points at me, and I'm like—"the guy you locked up is the guy who did—who shot the people in New Jersey." And he goes, "The guy you locked up," and he's pointing at me, and he points at him, so he goes back and forth. And at this point, it's one of—still to this day, and I say it out of all the interviews, it's one of the most

chilling statements that I've ever, you know, received from somebody.

. . . .

Q: Is—what did the defendant say when he was pointing at you, and what did he say when he was pointing at himself?

[Objection overruled.]

A: "The guy you locked up"—I'm sorry. "The guy you locked up is the guy who shot the people in New Jersey." (The witness demonstrates.)

[The New Jersey Supreme Court then described the testimony of Sol Cepero, who testified only at the trial of Petitioner's co-defendant, whose testimony is not relevant to Petitioner's case, before turning to the facts elicited at Petitioner's trial.]

At [Petitioner]'s trial, Heather Ballman, Janyce Watkins, and Michael Kreybig gave essentially the same testimony they gave at Gillispie's trial. As mentioned above, Sol Cepero did not testify at [Petitioner]'s trial.

Mercer's testimony during [Petitioner]'s trial was also similar to his testimony at Gillispie's trial. He explained in more detail, however, a conversation he had with his co-conspirators after the failed robbery in the Bronx:

Q: What conversations transpired when you got in the car?

A: [Petitioner] started going off. Yo, listen, man—you know, telling [Gillispie], Why you shoot the place up? You know, so [Gillispie] was blaming me saying I let the guy come up and approach him.

. . . .

A: Some—one of the guys I think he thinks tried to lunge for his gun, and that's why he started shooting.

In [Petitioner]'s trial, the other-crimes testimony was elicited from the ballistic expert, Detective Barry, in the same manner as in

Gillispie's trial. However, the following question was also asked by the prosecutor:

> Q: Okay. Now, if I were to tell you the jury has already heard from Detective Mojica that that was the bullet that literally fell out of one of the victims at the barbershop, could you tell us, did you examine that?

> A: Yes I did.

However, that bullet "did not have sufficient markings on it to indicate [whether] it was fired from [the] same gun or not."

The testimony of Detective Mojica, the responding officer at the Bronx barbershop shooting, was more abbreviated during [Petitioner]'s trial because there was no confession to introduce. But the other-crimes testimony was largely the same. Detective Mojica again testified as to the scene when he arrived at the barbershop:

> Q: Can you describe the scene for us when you arrived there, detective?

> A: Wow. There were several uniformed officers on the scene. There was an ambulance at the location. There were several people shot. . . . And the most severe person, Christopher [Folks], who was shot, was being treated by the EMS.

> Q: Okay. And how many times was he shot, detective?

> A: Four times. When I arrived to the scene, they were bringing him out on the stretcher. His eyes were rolling back. His chest was open, so you saw a bunch of—you could see actually the entrance wounds. At that time, the uniformed officer, the first uniformed officer on the scene, secured the location. And there was another ambulance arriving at the same time, so—to treat the other people who were shot.

Mojica continued to explain how he processed the ballistics evidence at the scene. The copper-round was again addressed:

A: It's one copper round that when Mr. [Folks] was being treated by EMS, they were pulling him out of the store, and—the store, the glass front, they were pulling him out. He was on a stretcher, and they hit the sidewalk. So he comes down on the sidewalk, and then they have to pick him up to put him inside the ambulance. And when they put him inside the ambulance and they lifted him up on the gurney, I don't know how, but it falls out of his body, this copper round.

Q: You saw that happen?

A: I picked it up.

. . . .

A jury found Gillispie guilty on all counts charged, but did not reach a unanimous verdict as to the penalty. Following merger, Gillispie was sentenced to two consecutive terms of life imprisonment without parole for the murders of Staton and Michael, a term of five years imprisonment for unlawful possession of a weapon, and a term of ten years imprisonment, with 85% to be served before parole eligibility, on the two burglary counts. The sentences on the weapons offense and the burglaries were made to run concurrently to each other, but consecutively to the second life sentence.

The capital prosecution of [Petitioner] was not pursued. A separate jury found him guilty on all charges. He was sentenced to two consecutive terms of life imprisonment with thirty years of parole ineligibility on each of the two counts of purposeful or knowing murder. The judge also imposed a five-year term for unlawful possession of a weapon, and a ten-year term of imprisonment on each count of burglary. These sentences were to run concurrently to each other, but consecutively to the two life sentences.

*State v. Gillispie*, 208 N.J. 59, 67-78 (2011).

Following their convictions, Petitioner and Gillispie appealed their convictions, and their appeals were consolidated by the Superior Court of New Jersey, Appellate Division. *Id.* at 78. On appeal, a panel of the Appellate Division found that, although the other crimes evidence regarding

the Bronx robbery had been properly admitted under *Cofield*, the trial court had failed to properly sanitize that evidence, and thus reversed Petitioner's conviction and remanded for retrial. *Id.* at 79-80. The Appellate Division also took issue with the jury instructions given at trial, suggesting that at the retrial the trial court should instruct the jury to take Mercer's plea agreement into account when assessing his credibility, and that the guilty plea of Mercer should not be viewed as evidence of the guilt of the defendants. *Id.* at 80. The state appealed, and the New Jersey Supreme Court granted certification. *Id.*

In its decision, the New Jersey Supreme Court overruled the Appellate Division and reinstated Petitioner's conviction and sentence. *Id.* In so doing, the court first noted the Appellate Division had found no error as to the jury charge as it related to Mercer's plea agreement, and that, in any event, the Court found no error based on the lack of a charge regarding Mercer's plea agreement which would warrant reversal of Petitioner's conviction. *Id.* at 83-84. The court then addressed the other crimes evidence and found, as had the Appellate Division, that the fact that that the same weapon was used in the Bronx robbery as in the shooting of the victims in Petitioner's case was admissible under state evidence rules to prove the identity of the shooter involved in both cases. *Id.* at 84-91. The Supreme Court, however, also agreed with the Appellate Division that the other details of the Bronx robbery which were admitted against Gillispie—including a bullet falling from a victim's body—should not have been admitted and that the Bronx robbery other crime evidence should have been properly sanitized before its admission. *Id.* at 91-93. The Supreme Court noted, however, that these "prejudicial details regarding the Bronx robberies were not admitted" at Petitioner's trial, and that, even had they been admitted, the evidence of the guilt of both Petitioner and Gillispie was so overwhelming that any mistake made by the trial court as to the admission of these facts or the failure to give a stronger jury charge sanitizing the Bronx

robbery information was ultimately harmless as the "the critical issue as to [Petitioner] was whether he was Gillispie's accomplice, and the proofs on that issue were undeniable." *Id.* at 94. Therefore, the Supreme Court reinstated Petitioner's conviction and remanded the case to the Appellate Division for the disposition of any appellate issues not previously addressed. *Id.*

On remand, Petitioner raised three arguments: (1) his sentence was excessive; (2) the jury charge at his trial failed to adequately explain accomplice liability as it related to the lesser-included offenses and the relevant mental states of purposefulness and recklessness; and (3) his defense counsel was prevented from fully cross-examining Keith Mercer at trial. *See State v. Gillispie*, 2012 WL 222949, at *10-11 (N.J. App. Div. Jan. 26, 2012). The Appellate Division rejected each of these contentions, finding the jury charges had more than adequately explained both individual and accomplice liability as well as the various mental states relevant to the lesser included charges, especially in light of the New Jersey Supreme Court's findings that overwhelming evidence of Petitioner's guilt as Gillispie's accomplice had been presented at trial and that the trial record revealed no evidence that the trial court had curtailed Petitioner's cross-examination rights in any meaningful way. *Id.* Consequently, the Appellate Division affirmed Petitioner's conviction and sentence. *Id.* Petitioner petitioned for certification, which, in June 2012, was denied by the New Jersey Supreme Court. *State v. Butler*, 210 N.J. 480 (2012). Petitioner did not file a petition for certiorari.

While Petitioner's appeal was pending, he filed a petition for post-conviction relief ("PCR") on January 3, 2012. *See State v. Butler*, 2015 WL 1943867, at *1 (N.J. App. Div. May 1, 2015). Following briefing, the trial court denied Petitioner's PCR petition without an evidentiary hearing in July 2013, and Petitioner appealed to the Appellate Division. *Id.* The Appellate Division affirmed the denial of PCR in May 2015. *Id.* at 1-2. Petitioner filed a petition for certification,

which, on October 29, 2015, was denied by the New Jersey Supreme Court. *See State v. Butler*, 223 N.J. 355 (2015). Petitioner filed his habeas petition with this Court.

## II. LEGAL STANDARD

Under 28 U.S.C. § 2254(a), the district court "shall entertain an application for a writ of habeas corpus [o]n behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." A habeas petitioner has the burden of establishing his entitlement to relief for each claim presented in his petition based upon the record that was before the state court. *See Eley v. Erickson*, 712 F.3d 837, 846 (3d Cir. 2013); *see also Parker v. Matthews*, 132 S. Ct. 2148, 2151 (2012). Under the statute, as amended by the Anti-Terrorism and Effective Death Penalty Act, 28 U.S.C. § 2244 ("AEDPA"), district courts are required to give great deference to the determinations of the state trial and appellate courts. *See Renico v. Lett*, 559 U.S. 766, 772-73 (2010).

Where a claim has been adjudicated on the merits by the state courts, the district court shall not grant an application for a writ of habeas corpus unless the state court adjudication

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2). Federal law is clearly established for these purposes where it is clearly expressed in "only the holdings, as opposed to the dicta" of the opinions of the United States Supreme Court. *See Woods v. Donald*, 125 S. Ct. 1372, 1376 (2015). "When reviewing state criminal convictions on collateral review, federal judges are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they

were wrong." *Id.* Where a petitioner challenges an allegedly erroneous factual determination of the state courts, "a determination of a factual issue made by a State court shall be presumed to be correct [and the] applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

## III.   DECISION

## A.   Petitioner's Other Crimes Evidence Claim

Petitioner first contends that the state courts erred in admitting improper other crimes evidence against him at trial, and that the admission of this evidence rendered his trial unfair. Because "the Due Process Clause does not permit the federal courts to engage in a finely-tuned review of the wisdom of state evidentiary rules," *see Marshall v. Lonberger*, 459 U.S. 422, 438 (1983), a challenge to the admissibility of evidence is normally considered a question of state law which is not cognizable in habeas corpus. *See Keller v. Larkins*, 251 F.3d 408, 416 n. 2 (3d Cir. 2001) ("A federal habeas court . . . cannot decide whether the evidence in question was properly allowed under the state law of evidence"); s*ee also Estelle v. McGuire*, 502 U.S. 62, 67-70 (1991); *Wilson v. Vaughn*, 533 F.3d 208, 213-14 (3d Cir. 2008), *cert. denied*, 556 U.S. 1170 (2009). Because habeas exists to remedy violations of federal law and not state law issues, a habeas petitioner may only seek relief in his habeas petition for a state law evidentiary issue where he can show that the admission of the evidence in question denied his right to due process under the Fourteenth Amendment insomuch as the evidence deprived him of the "fundamental elements of fairness in [his] criminal trial." *Glenn v. Wynder*, 743 F.3d 402, 407 (3d Cir. 2014) (quoting *Riggins v. Nevada*, 504 U.S. 127, 149 (1992) (Thomas, J. dissenting)). "The Supreme Court has 'defined the category of infractions that violate "fundamental fairness" very narrowly, based on the recognition that, beyond the specific guarantees enumerated in the Bill of Rights, the Due

Process Clause has limited operation.'" *Id.* (quoting *Medina v. California*, 505 U.S. 437, 443 (1992)). "In order to satisfy due process, [petitioner's] trial must have been fair, it need not have been perfect." *Id.* (citing *United States v. Hasting*, 461 U.S. 499, 508 (1983)). Therefore, a due process violation will only occur in the context of a state court evidentiary ruling when that ruling was "so arbitrary or prejudicial that it rendered the trial fundamentally unfair." *Scott v. Bartkowski*, No. 11-3365, 2013 WL 4537651, at *9 (D.N.J. Aug. 27, 2013) (citing *Romano v. Oklahoma*, 512 U.S. 1, 12-13 (1994)).

Here, Petitioner asserts the admission of Mercer's testimony regarding the prior robbery of a barber shop in New York constituted improper other crimes evidence which should not have been admitted under New Jersey law, and that this improper admission rendered his trial unfair. Initially, the Court must note that, on direct appeal, the New Jersey Supreme Court held that the challenged other crimes evidence was admissible against Petitioner in his trial under the New Jersey Rules of Evidence to establish the identity of the shooter, Petitioner's co-defendant Gillispie. *Gillispie*, 208 N.J. at 91. While the New Jersey Supreme Court did find that certain additional prejudicial information regarding the Barber Shop incident should not have been admitted in the trial of Petitioner's co-defendant, the Court noted "the prejudicial details regarding the Bronx robberies were not admitted at [Petitioner's] trial" and, therefore, only the admissible other crimes evidence was submitted at Petitioner's trial. *Id.* at 91-94. Accordingly, to the extent Petitioner asserts the other crimes evidence used against him was inadmissible under state law, he is incorrect.[2]

---

[2] The New Jersey Supreme Court did take issue with the limiting instruction given at trial regarding that evidence, but, as explained below, found any error in that regard entirely harmless. *Id.* at 92-94.

Because Petitioner has presented the Court with no Supreme Court case to which the New Jersey Supreme Court's decision was contrary, or which the New Jersey Supreme Court unreasonably applied, and has likewise failed to show their decision was an unreasonable reading of the facts of his case, Petitioner would only be entitled to relief if he could show the admission of other crimes evidence, regardless of its propriety under state law, is itself fundamentally unfair. Petitioner has failed to do so. As the Third Circuit has observed, there is no Supreme Court case which clearly establishes the admission of other crimes evidence such as that presented at Petitioner's trial

> constitutes a violation of federal fair trial rights. To the contrary, the most relevant Supreme Court cases suggest the contrary. *See, e.g., Estelle*[, 502 U.S. 62] (allowing evidence of prior injuries in a trial for infant murder, and refusing habeas relief for a deficient limiting instruction); *Greer v. Miller*, [483 U.S. 756 (1987)]; *Spencer v. Texas*, [385 U.S. 554] (1967)] (rejecting a due process challenge to a state rule admitting evidence of prior similar crimes when the judge gives a limiting instruction).

*Minett v. Hendricks*, 135 F. App'x 547, 553 (2005). Nothing in this record suggests the admitted other crimes evidence deprived Petitioner of a fundamentally fair trial, and Petitioner has presented no Supreme Court cases so establishing. Therefore, he is not entitled to habeas relief on this claim.

**B.      Petitioner's Jury Instruction Claims**

Petitioner next asserts the jury instructions given at his trial deprived him of a fair trial insomuch as they did not fully explain the interplay between the various mental states required for lesser included offenses and accomplice liability, and because the trial court did not give a proper limiting instruction regarding the other crimes evidence admitted at trial. That a jury "instruction was allegedly incorrect under state law is not a basis for habeas relief." *Duncan v. Morton*, 256 F.3d 189, 203 (3d Cir.) (quoting *Estelle v. McGuire*, 502 U.S. 62, 71-72 (1991)), *cert. denied*, 534 U.S. 919 (2001). A habeas petitioner can, therefore, receive relief based on an allegation of

improper jury instructions at trial only where "the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *Id.* (quoting *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977). The Supreme Court has held the "category of infractions that violate fundamental fairness" is very narrow, *Estelle*, 502 U.S. at 72-73, and the challenged jury instruction must be considered in the context of the entire charge and the trial as a whole, with habeas relief only be available where the charge was so erroneous that it resulted in a violation of Due Process in light of all the relevant facts. *Duncan*, 256 F.3d at 203. Even where the instruction in question was "undesirable, erroneous, or even universally condemned," habeas relief will not be warranted solely on that basis, and will only be available where the instruction rendered the trial fundamentally unfair. *Id.*

On direct review, the New Jersey Supreme Court determined that, while the other crimes evidence charge given at Petitioner's trial was not ideal under state law, any error in the other crimes evidence jury instruction was ultimately harmless in light of the "undeniable" proofs the Government provided as to Petitioner's guilt as an accomplice to Gillispie, and that Petitioner consequently received a fair trial despite any issues with that charge. On remand, the Appellate Division likewise reviewed the remaining jury instructions and concluded the trial court

> provided thorough charges to the jury. As relevant here, it instructed the jury on how a person may be found guilty individually and as an accomplice; the elements of criminal intent; the definition of "purposely" and "recklessly"; the elements of aggravated and reckless manslaughter; and the relationship of the general charges of accomplice liability with murder, aggravated manslaughter, and reckless manslaughter. [The Appellate Division discerned] little chance that the jury was misled, confused, or reached a verdict that was unwarranted by the evidence. Indeed, as the [New Jersey] Supreme Court noted, "[t]he critical issue as to [Petitioner] was whether he was Gillispie's accomplice, and the proofs on that issue were undeniable." *Gillispie*, . . . 208 N.J. at 94.

*Gillispie*, 2012 WL 222949 at *11.

Having reviewed the jury charges at Petitioner's trial, this Court concludes that these findings of the state courts are neither contrary to nor unreasonable applications of federal law in so much as Petitioner has failed in any meaningful way to show that the instructions in his trial were so erroneous as to render his trial fundamentally unfair. As the Appellate Division explained, the general charge given at trial was thorough and covered all of the necessary elements, as well as the interplay between accomplice liability, the relevant mental states, and the lesser included charges, all of which was proper under State law. Nothing in the charge appears to have had the capacity to mislead or corrupt the jury's determination of the facts, and this Court is convinced that the accomplice liability and lesser included offense jury charges did not render Petitioner's trial fundamentally unfair. Turning to the other crimes evidence jury charges, while the charge given may have technically been improper under state law, the Court agrees with the New Jersey Supreme Court that the charge in question was not so erroneous to render Petitioner's trial unfair in light of the undeniable proof of Petitioner's guilt as an accomplice to Gillispie. The ailing charge was essentially harmless in light of that proof and did not render his trial fundamentally unfair. Therefore, Petitioner is not entitled to habeas relief on that basis. *Duncan*, 256 F.3d at 203.

## C.     Petitioner's Confrontation Claim

In his next claim, Petitioner asserts the trial court denied him his right to confront the witnesses against him by restricting defense counsel's cross-examination of Keith Mercer. Specifically, Petitioner asserts counsel was prevented from questioning Mercer regarding his drug dealing activities at the time of the crimes and was not permitted to question Mercer more fully regarding his purported drug dealing operations in New Jersey. Petitioner's claim centers on a portion of counsel's cross examination in which counsel attempted to ask Mercer whether he knew a man named "Shaka" in Lakewood, New Jersey, and whether this person sold drugs for Mercer.

(*See* ECF No. 11-2 at 175-76.) Although Mercer admitted he knew a Shaka, he denied Shaka sold drugs for him. (*Id.* at 176.) The State objected to this line of questioning, ostensibly because there was no basis for the questioning in the discovery record, and no information had been proffered by defense counsel regarding Shaka or any dealings Mercer had in Lakewood. (*Id.*) When asked for a basis for the question, counsel stated all he had was the information Petitioner had provided him regarding Shaka and Lakewood and that he sought to ask these questions to impeach Mercer based on earlier testimony that he was no longer involved in drug dealing and that he knew little about New Jersey. (*Id.* at 176-77.) The trial judge limited this avenue of questioning, finding it to be little more than a fishing expedition into an area the State had not had the opportunity to investigate and which would not be corroborated or supported by any factual basis provided in Petitioner's case in chief. (*Id.* at 179-85.) The trial court required defense counsel to rephrase his question as to whether Shaka sold drugs for Mercer. (*Id.* at 186.) Because Mercer had already denied that Shaka sold drugs for him and because counsel rephrased his line of questioning, counsel was permitted to question Mercer regarding his knowledge of other parts of New Jersey and whether he knew Shaka. (*Id.* at 175-76, 187-88.)

Petitioner asserts this instance, in which one avenue of cross examination was limited for not having a basis in the trial or discovery record, amounts to the trial court's curtailment of his right to confront Mercer, despite the extensive and significant cross-examination of Mercer counsel was otherwise permitted to pursue. The Sixth Amendment guarantees a criminal defendant the right "to be confronted with the witnesses against him," which "includes the right to conduct reasonable cross-examination." *Wright v. Vaughn*, 473 F.3d 85, 93-94 (3d Cir. 2006) (internal quotations omitted). A criminal defendant can therefore state a violation of his rights under the Confrontation Clause "by showing that he was prohibited from engaging in otherwise appropriate

cross-examination" which would "expose the jury [to facts] from which jurors . . . could appropriately draw inferences relating to the reliability of the witness." *Olden v. Kentucky*, 488 U.S. 227, 231 (1988) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 680 (1986)). The Confrontation Clause is not unlimited in scope – cross-examination is still subject to the discretion of trial judges to curtail improper questioning and to limit repetitive and otherwise irrelevant testimony on cross-examination. *Wright*, 473 F.3d at 93. However, allegations that a trial court's rulings curtail a Petitioner's cross-examination of a witness and violate the Confrontation Clause are subject to harmless error analysis. *Id.* (citing *Van Arsdall*, 475 U.S. at 684). When raised on collateral review, errors of a constitutional dimension will be considered harmless and will not warrant habeas relief "unless [the alleged constitutional error] had a substantial and injurious effect or influence in determining the jury's verdict." *Fry v. Piller*, 551 U.S. 112, 116 (2007); *see also Brecht v. Abrahamson*, 507 U.S. 619, 631 (1993).

In reviewing Petitioner's claim of a Confrontation Clause violation, the Superior Court of New Jersey found no violation of the Clause as the trial court in large part had permitted Petitioner's defense counsel to pursue a wide swath of cross-examination to elicit various forms of testimony designed to impeach Mercer's credibility and, therefore, had not materially limited Petitioner's right to confront Mercer. *Gillispie*, 2012 WL 222949 at *11. Having reviewed the record, this Court agrees and finds this conclusion is neither contrary to nor an unreasonable application of federal law. Although the trial court did limit counsel's questioning regarding Shaka, that limitation did not prevent counsel from questioning Petitioner as to whether he knew Shaka, whether he knew more about New Jersey that he had let down, and the record even contains Mercer's explicit denial that Shaka sold drugs on his behalf. (*See* ECF No. 11-2 at 174-87.) Ultimately, given the fact that the record contains this denial and given the extensive further cross-

examination counsel elicited from Mercer, any error that could arguably be asserted was ultimately harmless – Petitioner has failed to show how any further information regarding Shaka could have had a substantial and injurious effect upon the jury verdict at his trial, and he would not be entitled to relief even if the Court were inclined to agree that the curtailment of cross amounted to a Confrontation Clause violation. *Wright*, 473 F.3d at 93; *see also Fry*, 551 U.S. at 116; *Brecht*, 507 U.S. at 631. Therefore, Petitioner is not entitled to habeas relief as to this claim.

**D.     Petitioner's Ineffective Assistance of Counsel Claims**

In his final pair of claims, Petitioner asserts he received ineffective assistance of counsel insomuch as trial counsel did not adequately cross examine Keith Mercer and failed to seek the exclusion of Petitioner's "street name" from trial. The standard which applies to such claims is well established:

> Claims of ineffective assistance are governed by the two-prong test set forth in the Supreme Court's opinion in *Strickland v. Washington*, 466 U.S. 668 (1984). To make out such a claim under *Strickland*, a petitioner must first show that "counsel's performance was deficient. This requires [the petitioner to show] that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Id.* at 687; *see also United States v. Shedrick*, 493 F.3d 292, 299 (3d Cir. 2007). To succeed on an ineffective assistance claim, a petitioner must also show that counsel's allegedly deficient performance prejudiced his defense such that the petitioner was "deprive[d] of a fair trial . . . whose result is reliable." *Strickland*, 466 U.S. at 687; *Shedrick*, 493 F.3d at 299.
>
> In evaluating whether counsel was deficient, the "proper standard for attorney performance is that of 'reasonably effective assistance.'" *Jacobs v. Horn*, 395 F.3d 92, 102 (3d Cir. 2005). A petitioner asserting ineffective assistance must therefore show that counsel's representation "fell below an objective standard of reasonableness" under the circumstances. *Id.* The reasonableness of counsel's representation must be determined based on the particular facts of a petitioner's case, viewed as of the time of the challenged conduct of counsel. *Id.* In scrutinizing counsel's performance, courts "must be highly deferential . . . a court must indulge a strong

presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.

Even where a petitioner is able to show that counsel's representation was deficient, he must still affirmatively demonstrate that counsel's deficient performance prejudiced the petitioner's defense. *Id.* at 692-93. "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. The petitioner must demonstrate that "there is a reasonable probability, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694; *see also Shedrick*, 493 F.3d at 299. Where a "petition contains no factual matter regarding *Strickland's* prejudice prong, and [only provides] . . . unadorned legal conclusion[s] . . . without supporting factual allegations," that petition is insufficient to warrant an evidentiary hearing, and the petitioner has not shown his entitlement to habeas relief. *See Palmer v. Hendricks*, 592 F.3d 386, 395 (3d Cir. 2010). "Because failure to satisfy either prong defeats an ineffective assistance claim, and because it is preferable to avoid passing judgment on counsel's performance when possible, [*Strickland*, 466 U.S. at 697-98]," courts should address the prejudice prong first where it is dispositive of a petitioner's claims. *United States v. Cross*, 308 F.3d 308, 315 (3d Cir. 2002).

*Judge v. United States*, 119 F. Supp. 3d 270, 280-81 (D.N.J. 2015).

In his first ineffective assistance claim, Petitioner asserts his trial counsel did not adequately cross-examine the State's chief witness, Keith Mercer. Having reviewed the record of Petitioner's trial and the extensive cross-examination of Mercer conducted by counsel during trial, this Court agrees with the New Jersey Courts; counsel's cross-examination of Mercer was more than adequate. Counsel cross-examined Mercer over the course of two days and covered topics including: Mercer's history of drug convictions, the violent actions Mercer took during the crimes in question, the plea deal he received in exchange for his testimony, and inconsistencies in Mercer's trial testimony and between his testimony and earlier statements. (*See* ECF Nos. 11-2, 11-3.) To the extent Petitioner asserts counsel should have more thoroughly "prepared" to cross-examine Mercer about an individual named Shaka and Mercer's knowledge of New Jersey

based on information Petitioner gave to counsel, his suggestion that counsel, was not prepared is not supported by the record. Instead, the record shows counsel did question Mercer about Shaka and Mercer's knowledge of New Jersey, and that it was an objection from the State, rather than any lack of preparation by defense counsel, that foreclosed some of that questioning. Ultimately, this Court agrees with the state courts that counsel's cross-examination of Mercer was thorough, probing, and more than adequate to amount to reasonably competent representation. As such, Petitioner has failed to show deficient performance on counsel's part, and his ineffective assistance claim must fail.

In his final claim, Petitioner asserts his counsel proved ineffective in failing to object to the admission into evidence of his "street name," "Shaft." Ultimately, Petitioner cannot show he was prejudiced by counsel's failure to object to the use of his alias at trial. Upon examination of the trial record, it is clear the reason the alias was used is because, at the time in question, it was the only name by which some of the witnesses, including Keith Mercer, knew Petitioner. Although Petitioner asserts in his petition the use of the name "Shaft" was indicative of his being a member of a criminal class, he provides little support for this contention other than his own opinion that his street name had a negative connotation. Nothing in the record suggests the State tried to connect Petitioner's alias to any sort of criminal class, or that it was anything other than a nickname Petitioner used among his acquaintances, including Keith Mercer. Likewise, although Petitioner asserts the name was used repeatedly, the name Shaft appears only a handful of times, and never in a context clearly suggesting prejudice to Petitioner. Because Petitioner has not demonstrated he was prejudiced by the admission of his "street name" into evidence without objection, he has failed to show the state courts' decisions were based upon an unreasonable application of *Strickland* or

an unreasonable application of the facts in evidence at trial. Therefore, Petitioner is not entitled to habeas relief as to this claim.

## IV.   CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. §2253(c), a petitioner may not appeal from a final order in a habeas proceeding where that petitioner's detention arises out of his state court conviction unless he has "made a substantial showing of the denial of a constitutional right." "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude that the issues presented here are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003); *see also Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Because jurists of reason would not disagree with this Court's conclusion that Petitioner has failed to make a substantial showing of the denial of a constitutional right insomuch as Petitioner's claims are without merit, Petitioner's habeas petition is inadequate to deserve encouragement to proceed further and a certificate of appealability is therefore denied.

## V.   CONCLUSION

For the reasons stated above, Petitioner's amended habeas petition (ECF No. 5) is **DENIED** and Petitioner is **DENIED** a certificate of appealability. An appropriate order will follow.

**Date:**  May 11, 2018               */s/ Brian R. Martinotti* _____
                                           **HON. BRIAN R. MARTINOTTI**
                                           **UNITED STATES DISTRICT JUDGE**